UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tara Marie Coderre,

       Plaintiff,

       v.                                                    Civil Action No. 2:11-CV-197

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 9, 10)

Plaintiff Tara Marie Coderre brings this action pursuant to 42 U.S.C. § 405(g) of

the Social Security Act, requesting review and remand of the decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits.  Pending before the Court are Coderre's motion to reverse the

Commissioner's decision (Doc. 9), and the Commissioner's motion to affirm the same

(Doc. 10).  For the reasons stated below, the Court GRANTS Coderre's motion, DENIES

the Commissioner's motion, and REMANDS for further proceedings and a new decision.

## Background

Coderre was twenty-four years old on her alleged disability onset date of

May 1, 2006.  She has a tenth grade education; and has worked as a bottle redemption

worker, a taxi driver, a convenience store clerk, a fast food worker, a telephone catalogue

salesperson, a waitress, and a dishwasher.  (AR 42-47, 76, 243, 301.)  Coderre claims that

none of these jobs was long-lasting because she either had conflicts with management or

problems dealing with customers.  (AR 44-47, 64, 326; *see also* AR 299-300.)  Along with holding many short-term jobs, Coderre has lived in many different localities in her adult life.  For example, since 2009, she has lived in New York, South Carolina, and Vermont.  (AR 627.)

Coderre is divorced, and has three children who were ages thirteen, ten, and eight on the date of the administrative hearing, March 3, 2011.  (AR 41.)  She testified at the hearing that she has lost parental rights to her eldest child; her middle child was living with her father at the time; and she cared for her youngest child on weekends.  (AR 43; *see also* AR 514.)

Coderre has a history of significant childhood abuse in both biological and adoptive families.  (AR 514.)  Specifically, the record reflects that she was raped by her biological father when she was three years old, and thereafter placed in foster care.  (AR 513.)  She was adopted at age five, but was removed from that home at age twelve because she was molested by three cousins and two uncles in that family.  (*Id.*)  She lived in other foster homes and boarding schools until she was eighteen years old, and was raped three more times by the age of twenty.  (*Id.*)  In addition to her traumatic childhood, the record demonstrates that Coderre has had an adult pattern of unstable and abusive relationships, and chaotic life-management.  (AR 514.)  She has also had a history of alcohol and substance abuse, and has suffered from chronic low back pain, fainting spells, depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), learning disabilities, and possible bipolar disorder and obsessive-compulsive disorder ("OCD").  (AR 490, 496, 512-14, 794.)

2

On July 14, 2009, Coderre filed an application for disability insurance benefits. Therein, she alleged that she had been unable to work since May 1, 2004 due to depression, PTSD, anxiety, mood swings, ADHD, OCD, fainting, problems with reading comprehension, back problems, borderline bipolar disorder, and asthma.  (AR 241-42.) Later, she amended her alleged disability onset date to May 1, 2006.  (AR 326.)  On March 3, 2011, Administrative Law Judge ("ALJ") Dory Sutker conducted a hearing on Coderre's application.  (AR 33-86.)  Coderre appeared and testified, and was represented by counsel.  A vocational expert ("VE") also appeared and testified at the hearing.  On March 9, 2011, the ALJ issued a decision finding that Coderre was not disabled under the Social Security Act from her alleged onset date through the date of the decision.  (AR 13-26.)  A few months later, the Decision Review Board ("DRB") notified Coderre that it was affirming the ALJ's decision, as supplemented with an additional rationale and a correction.  (AR 1-4.)  Having exhausted her administrative remedies, Coderre filed the Complaint in this action on August 5, 2011.  (Doc. 3.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to

3

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

    If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

    Employing this sequential analysis, ALJ Sutker first determined that Coderre had not engaged in substantial gainful activity since her alleged disability onset date of May 1, 2006.  (AR 15.)  At step two, the ALJ found that Coderre had the following severe impairments: affective disorder, anxiety disorder, ADHD, PTSD, foraminal

narrowing of the cervical and lumbar spines, and a mild focal lesion of the right ulnar

nerve.  (AR 16.)  Conversely, the ALJ found that Coderre's asthma was not severe.  (*Id.*)

At step three, the ALJ determined that none of Coderre's impairments, alone or in

combination, met or medically equaled a listed impairment.  (AR 16-18.)

Next, the ALJ determined that Coderre had the RFC to perform "light work," as

defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Coderre] can perform fingering on a frequent basis only.  She can never
> climb ladders, ropes, or scaffolds; she must avoid all workplace hazards.
> [She] is limited to routine and repetitive tasks and would need to perform
> these tasks in a solitary fashion, but could be in proximity to others.  She
> should have no interaction with the general public and only routine
> interaction with supervisors.  She requires an environment with few, if any,
> workplace changes.

(AR 18.)  Given this RFC, the ALJ found that Coderre was unable to perform her past

relevant work.  (AR 24.)  Nonetheless, relying on testimony from the VE, the ALJ found

that Coderre was able to perform jobs existing in significant numbers in the national

economy, including the "light work" jobs of chambermaid, office mail clerk, cashier, and

hand packer; and the "sedentary work" jobs of charge counselor and eyeglass assembler.

(AR 25.)  The ALJ concluded that Coderre had not been under a disability from her

alleged onset date of May 1, 2006 through the date of the decision.  (*Id.*)

As noted above, the DRB affirmed the ALJ's decision, but added further rationale

regarding the ALJ's analysis of the treating source opinions, and corrected the ALJ's

step-five finding regarding Coderre's ability to perform jobs existing in significant

numbers in the national economy.  (AR 1-2.)  Specifically, the DRB noted that the ALJ's

decision contained an inaccurate description of the VE's testimony, and corrected that

inaccuracy to determine that Coderre would be able to perform the "light" jobs of

chambermaid, office mail clerk, office helper, and hospital cleaner.  (AR 2.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a

"review [of] the administrative record *de novo* to determine whether there is substantial

evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v.

Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I.   ALJ's Analysis of "Acceptable Medical Source" Opinions

Coderre argues that the ALJ erred in affording "little weight" to the opinions of treating psychiatrists Richard Edelstein, M.D. and Michael McNamara, D.O.[1]  In response, the Commissioner asserts that the ALJ properly discounted these opinions because they were inconsistent with the record as a whole.

In February 2011, after treating Coderre for approximately one-and-one-half years, Dr. Edelstein opined that Coderre had "a lot of difficulty with interpersonal relationships of all sorts" (AR 804), and that these "[i]nterpersonal problems ma[d]e sustaining any job unlikely" (AR 806).  The doctor further opined that, although Coderre had only "[s]light" restrictions of activities of daily living, she had "[m]arked" difficulties in social functioning, including responding to co-workers and supervisors, and dealing with the public and work stresses.  (AR 802, 804.)  Dr. Edelstein also stated that, although Coderre was only "slight[ly]" limited in her ability to understand, remember,

---

[1] "D.O." stands for "doctor of osteopathy," and the regulations provide that licensed osteopathic doctors are considered "acceptable medical sources," 20 C.F.R. § 404.1513(a)(1), meaning their opinions may be used to establish the existence of a medically determinable impairment and are subject to the "treating physician rule," discussed below.  SSR 06-03p, 2006 WL 2329939, at *2 (2006) (citing 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1527(d)).

and carry out instructions, she was "extreme[ly]" limited in her ability to "[b]ehave in an emotionally stable manner" and "[r]elate predictably in social situations."  (AR 805.) The doctor further stated that Coderre had "frequent mood swings, . . . from depression to intense irritability" (AR 802); "[wa]s extraordinarily susceptible to frustration or stress, causing emotional lability[2] [and] behavioral dyscontrol[3]" (AR 803); and "ha[d] more than [two] days of emotional lability per month" (AR 806).

Similarly, in treatment notes, Dr. McNamara diagnosed Coderre with ADHD, insomnia, depression, PTSD, suspected borderline personality disorder, "suspected Bipolar Spectrum Disorder with severe Attention Deficit and a history of post-traumatic stress symptoms," possible "Major Depression with mood swings," and "possible learning disabilities."  (AR 488-98.)  In December 2007, the doctor stated that Coderre "ha[d] a history of impulsive behaviors."  (AR 495.)  Approximately one month later, after treating Coderre for approximately one year, Dr. McNamara opined that he "doubt[ed] [Coderre could] tolerate full-time employment at this time."  (AR 496.)

The "treating physician rule" requires that a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  20 C.F.R. §

---

[2] "Emotional lability" is defined as "[e]xcessive emotional reactivity associated with frequent changes or swings in emotions and mood."  F.A. Davis Co., TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011), *available at* Lexis TABMED.

[3] "Dyscontrol syndrome" is "a condition marked by sudden outbursts of violence or rage, associated with abnormal electrical discharges in the . . . brain."  F.A. Davis Co., TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011), *available at* Lexis TABMED.

404.1527(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993). Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to significant consideration, given that the treating physician "[is] likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). Under the Commissioner's regulations, the ALJ must consider certain factors – including the length of the treatment relationship, the frequency of examination, the provider's specialty, whether the provider's opinion is supported by evidence, and whether the provider's opinion is consistent with the record – when assigning weight to the opinion of a treating source. *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)). Furthermore, "the regulations require that the ALJ 'always give good reasons' in his decision for the weight he assigns to the opinions of treating physicians." *Richardson*, 443 F. Supp. 2d at 417 (quoting 20 C.F.R. § 404.1527(d)(2)); *see Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

Here, the ALJ failed to consider the length and frequency of Coderre's treatment relationships with Drs. Edelstein and McNamara. She also failed to recognize that these providers specialized in psychiatry, the area of specialization most relevant to Coderre's disabling impairments. The ALJ (and DRB) did, however, provide a fairly detailed

9

analysis of Dr. Edelstein's and Dr. McNamara's opinions, stating that they were entitled

to "little weight" on the grounds that (1) they were not supported by or consistent with

the evidence of record, including the medical record; and (2) they were inconsistent with

Coderre's activities of daily living.  (AR 23; *see also* AR 1-2.)  The Court has reviewed

the record, and finds that substantial evidence does not support these findings, as

explained below.

### A.    Consistency with the Medical Record and Other Medical Opinions

Dr. Edelstein's and Dr. McNamara's opinions are clearly consistent with each

other: they both opined that Coderre had mood swings and impulsive behaviors which

limited her ability to function.  Moreover, Dr. Edelstein's and Dr. McNamara's opinions

are supported by the treatment notes of Coderre's treating counselor, Gretchen Lewis;

Coderre's treating Nurse Practitioner, Sylvia Ingerson, who was affiliated with Dr.

McNamara's office; and Coderre's treating primary care physician, Dr. John Lippmann.

Counselor Lewis, who treated Coderre since May 2006 for over a four-year period

(AR 794), reported the following diagnoses for Coderre in January 2011: PTSD, bipolar

disorder, depression, anxiety, OCD, and ADHD.  (AR 794.)  Lewis noted that these

diagnoses were made "in conjunction with her psychiatrist."  (*Id.*)  Like Dr. Edelstein,

Lewis opined that Coderre had "[m]arked" difficulties in social functioning, explaining

that she typically could do well for up to four months at a time "before decompensating

to the point where she experience[d] a significant loss in adaptive functioning as

manifested by difficulties in . . . maintaining social relationships."  (AR 795.)  Also like

Dr. Edelstein, Lewis opined that Coderre had "[m]arked" limitations in responding to

10

supervision and dealing with work stresses.  (AR 797.)  Lewis added that Coderre was

unable to handle authority, had social insecurities and difficulty handling social

situations, was easily distracted, and felt attacked by supportive feedback.  (AR 797-98.)

In a January 2011 letter to Coderre's counsel, Lewis advised that Coderre had recently

lost approximately the fifth job since she had begun treating with Lewis, and stated that

Coderre "was crushed and there was an onslaught of depression and mood instability

including nightmares, panic attacks[,] and some traces of personality disorder."  (AR

793.)  An earlier August 2009 psychological report from Lewis is consistent with her

more recent opinions, stating as follows:

> I think [Coderre] has very typical bipolar diagnosis along with some
> substance abuse issues and a traumatic history. . . .  She has just got a lot
> going on and does not seem to be capable of staying in one place let alone
> holding a job in one place.  She has been all over the place, different states,
> different locations[,] all over our community. . . .  [S]he has not really been
> stabilized on medications yet, although she is extremely compliant with
> treatment.

(AR 578.)

The opinions and treatment notes of Nurse Practitioner Ingerson, who treated

Coderre from June 2006 until July 2007 (AR 481, 488; *see* AR 473-87), are consistent

with not only Counselor Lewis's opinions and treatment notes, but also with those of Drs.

Edelstein and McNamara.  Specifically, in March 2007, Ingerson diagnosed Coderre with

bipolar and mood disorders, ADHD, borderline personality disorder, and polysubstance

abuse.  (AR 479, 480.)  In treatment notes, Ingerson repeatedly characterized the severity

of Coderre's mental illness as "moderately high," "moderate to high," or "high" (*see,*

*e.g.*, AR 474, 475, 478, 479); and she noted that Coderre's level of safety risk

(particularly to herself) was "high" in part due to Coderre's "impulsivity," "poor judgment," and anger (*see, e.g.*, AR 474, 475, 477, 480).  On multiple occasions, Ingerson recorded that she needed to "[m]onitor [Coderre's] safety on an ongoing basis." (AR 478; *see also* AR 479, 480.)  She described Coderre as "[i]mpulsive, inconsistent[,] and not reliable" (AR 480), and noted that Coderre's "mood becomes unstable, [and she] can become very agitated and angry as well as suicidal from her history" (AR 479).  In a January 2007 opinion letter, Ingerson stated that Coderre "has a long history of mood disorder, polysubstance use[,] and ADHD[, as well as] features of borderline and antisocial personality disorders."  (AR 481.)

Finally, the treatment notes of Coderre's treating primary care physician, Dr. Lippmann, are consistent with the opinions of Coderre's treating psychiatrists, Drs. Edelstein and McNamara.  In August 2008, Dr. Lippmann stated in a treatment note that, although Coderre was doing well overall and although her back and neck pain were "stable"; she still presented with anxiety, depression, low energy, fatigue, and "[m]ood changes and [t]rouble concentrating."  (AR 505.)  Dr. Lippmann further stated that Coderre's depression had a "severe" impact on her ability to work and engage in recreational activities.  (AR 504.)  He diagnosed Coderre with "atypical depressive disorder," and stated that she was "continu[ing] to work [on this] with Dr. McNamara." (AR 506.)

Given the consistency among the medical opinions and treatment records of treating providers Dr. Edelstein, Dr. McNamara, Counselor Lewis, Nurse Practitioner Ingerson, and Dr. Lippmann, all of whom opined that Coderre had mental impairments

resulting in serious social limitations; the Court does not find that substantial evidence

supports the ALJ's decision to afford "little weight" to the opinions of Drs. Edelstein and

McNamara partly on the grounds that these opinions are not "supported by the evidence

of record." (AR 23.) *See Murdaugh v. Sec'y of Dept. of Health & Human Servs.*, 837

F.2d 99, 101-02 (2d Cir. 1988) (where all physicians who examined claimant agreed that

claimant was disabled, differing only as to the extent of claimant's disability, and only

one agency consultant found claimant not disabled, court remanded, finding that

substantial evidence did not contradict treating physician's opinion that claimant was

incapable of performing sedentary work).  Moreover, it cannot be said that the ALJ's

flawed decision regarding the opinions of Drs. Edelstein and McNamara was harmless

because her RFC determination – which allows for work "[with]in proximity to others"

and involving "routine interaction with supervisors" – does not account for the significant

social limitations attributed to Coderre by these psychiatrists.

   Furthermore, the Court finds that substantial evidence does not support the ALJ's

decision to afford "great weight" to the agency consultant opinions.  (AR 23-24.)  The

only reasons provided by the ALJ for this decision were that (a) the consultants' opinions

were "supported . . . with references to the objective medical record" (AR 23-24), and (b)

the consultants "are experts and well[-]experienced with the disability benefits review

process" (AR 24).  The ALJ failed to consider that, despite their level of experience and

expertise, none of the consultants examined or treated Coderre, in contrast to Drs.

Edelstein and McNamara.  In general, "the written reports of medical advisors who have

not personally examined the claimant deserve little weight in the overall evaluation of

13

disability [because t]he advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) (quotation marks omitted) (citations omitted); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ also failed to specifically recognize that each of the consultants' reports was prepared before Dr. Edelstein and Counselor Lewis offered their 2011 opinions, and thus none of the consultants had the opportunity to consider these important opinions in their reports. The Second Circuit has held that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician. *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).

### B.   Consistency with Coderre's Daily Activities

As noted above, the ALJ also supported her decision to afford "little weight" to the opinions of treating psychiatrists Drs. Edelstein and McNamara on the grounds that these opinions were not consistent with Coderre's activities of daily living, including her ability to independently care for herself, complete household chores, play computer games[4], exercise, cook, and watch television[5]. (AR 20-21, 23.) None of these activities,

---

[4]   Coderre's computer use demonstrates little regarding Coderre's social abilities because it may be assumed that she was able to use the computer in solitude. Noteworthy, however, at least one provider stated that Coderre's sometimes excessive computer use (for seventeen hours a day at one period, by self-report (AR 265)) was "a dependency thing" (AR 478). Thus, it appears that Coderre's computer use was in fact a manifestation of her mental impairments, rather than an indication of her ability to function in a work setting, as the ALJ characterized it.

however, reflects Coderre's ability to function socially, which her treating providers have definitively opined is her most debilitating impairment.  The ALJ also noted that Coderre reported being able to grocery shop, go to the beach twice a month, and talk on the phone "all day" (AR 21), which activities do indeed arguably reflect an ability to socialize.  However, a deeper look at the record reveals that these activities demonstrate a very minimal level of social functioning.  First, the ALJ's statement that Coderre reported talking on the telephone "all day" is inaccurate.  (AR 21 (citing AR 295).)  In fact, Coderre stated that she talked on the telephone "daily," and there is no indication of how long she talked on the phone and to whom.  It cannot be deduced from the fact that an individual is able to talk on the telephone daily that she is also able to maintain social functioning during a typical forty-hour workweek.  With respect to Coderre's grocery shopping, she reported that she shopped for 30-45 minutes once a month, and for 5-10 minutes once or twice a month.  (AR 264.)  Grocery shopping only three times each month, two of those times for ten minutes or less, does not reflect an ability to socially function at a full-time job.  Regarding Coderre's ability to take trips to the beach twice a month, that activity also does not reveal much about Coderre's ability to maintain social functioning at a full-time job, given that no detail is provided in the record concerning these trips.  (AR 265.)

---

[5]   The ALJ also noted that, "[f]or a period of time, [Coderre] was living with an older man and doing all the housework and caring for him."  (AR 21 (citing AR 480).)  But the ALJ failed to note that the "Pyschopharmacology Progress Note" cited to for this fact also states that Coderre presented with a blunt affect, a loud voice volume, and an anxious mood; required monitoring "on an ongoing basis" because she was at a "[h]igh" level of safety risk, lacked self-care, and was acting impulsive, inconsistent, and unreliable; and was exhibiting "evidence of mania."  (AR 480.)

The ALJ noted that it was "curious[]" that Coderre stated "on the same page" of one of her Function Reports both that she (a) did not leave her house much, and (b) tried to go somewhere at least once each day.  (AR 21 (citing AR 295)).  But these statements are not necessarily conflicting, and in any event, "go[ing] somewhere at least once a day" (AR 295) does not reflect more than a very minimal amount of socializing.  Moreover, also on the same page, Coderre listed the places that she went each day, including medical offices for medical appointments, physical therapy, and counseling; and the supermarket.  (*Id.*)  These limited excursions do not reflect more than a minimal level of social functioning for short durations.  Furthermore, Coderre consistently stated in her Function Reports that she spent little time with people and attempted to avoid them.  For example, in her August 2009 Function Report she stated that she did not "do outside work because [she did not] want to run into people" (AR 264), that she "tr[ied] to spend minimal time w[ith] people," that her conversations with people "[we]re brief," and that she spent time with people "very infrequently."  (AR 265.)  She listed the places that she went on a regular basis as the community center, doctors' offices, and the counselor's office, and stated that she "only [went] to the places [she] ha[d] to go to and [only took] part as needed."  (*Id.*)  She further stated that she was "very unsociable" and "isolate[d]" from people.  (AR 266.)

Considering the record as a whole, including the opinions and treatment notes of Coderre's treating providers, the Court does not find that Coderre's daily activities support the ALJ's decision to afford "little weight" to the opinions of Drs. Edelstein and McNamara.  *Murdaugh*, 837 F.2d at 102 (citing 42 U.S.C. § 1382c(a)(3)(A)) ([A]lthough

claimant "receives conservative treatment, waters his landlady's garden, occasionally visits friends[,] and is able to get on and off an examination table can scarcely be said to controvert the medical evidence. . . . [A] claimant need not be an invalid to be found disabled under . . . the Social Security Act.").

## II.    ALJ's Credibility Determination

The ALJ's flawed analysis of the treating physician opinions is reason enough to remand this matter to the Commissioner for further review.  In an effort to provide guidance on remand, however, the Court briefly addresses Coderre's argument that the ALJ failed to conduct a proper credibility analysis.

The ALJ (and the DRB, to a lesser extent) found that Coderre was "only partially credible" (AR 21) partly due to her "inability to be forthcoming" about her continued alcohol and substance abuse, and partly due to her non-compliance with prescribed treatment regimens (AR 22)[6]  The record does in fact indicate that Coderre was sometimes dishonest with her medical providers about her alcohol and substance use, and frequently did not follow prescribed treatment regimens.  For example, in a March 2007 treatment note, Nurse Practitioner Ingerson stated that Coderre had been "unreliable . . . as far as admitting to any alcohol or drug use" and was "not always reliable in the information she provides."  (AR 479.)  And in a July 2009 report, Dr. Edelstein noted that Coderre had stopped medications prescribed by Dr. McNamara "due to finances and in any case was out of the area . . . ."  (AR 512.)

_____

[6]  The ALJ also based her credibility determination on Coderre's daily activities.  (AR 21-22.)  As discussed above, however, many of these activities exhibited Coderre's physical abilities rather than her ability to function socially, which the record demonstrates was her most debilitating impairment.

17

An ALJ is certainly "entitled to view with skepticism the testimony of an applicant who has been deceptive." *Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008). Thus, the ALJ's consideration of Coderre's apparent dishonesty regarding her alcohol and substance abuse during the alleged disability period was proper. The ALJ should have considered in more depth, however, Coderre's apparent failure to follow prescribed treatment plans, given that such failure may have been a symptom of Coderre's mental impairments, particularly her suspected bipolar disorder. The Seventh Circuit recently addressed this issue in *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011), finding as follows:

> The ALJ apparently concluded that Jelinek's symptoms would have remained under control but for an unwillingness to take her medications as directed. But *we have often observed that bipolar disorder, one of Jelinek's chief impairments, is by nature episodic and admits to regular fluctuations even under proper treatment.* ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.

*Id.* (emphasis added) (citations omitted).

Although not all of Coderre's treating providers definitively diagnosed her with bipolar disorder, the record consistently demonstrates that she suffered from episodic mood changes and behavioral shifts, resulting in fluctuations of functioning levels, even under proper treatment. (*See, e.g.,* AR 514.) The record also demonstrates that some of the symptoms of Coderre's mental illness were impulsivity, inconsistency, and lack of reliability, resulting in chaotic life management, failure to hold a job for any significant length of time, and changing residences frequently. (*See, e.g.,* AR 480, 578, 711, 793,

802-03, 805-06.)  In an August 2009 report, Counselor Lewis noted that Coderre "ha[d] not stayed in one place for any length of time," and conjectured that her failure to comply with treatment regimens was caused by her failure to "stick around for treatment long enough to tell whether it [wa]s working or what med[ications] could be changed to benefit her further."  (AR 578.)  Given these facts, on remand, if the ALJ's credibility (or other) determination is affected by Coderre's failure to follow prescribed treatment regimens, the ALJ should consider the reasons for such failure.  *See Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985) (a claimant's refusal to undertake treatment must be "without justifiable excuse"); *Pimenta v. Barnhart*, No. 05 Civ. 5698(JCF), 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) (quoting SSR 82-59, 1982 WL 31384, at *4 (1982)) ("In accordance with . . . SSR 82-59, a claimant may have legitimate reasons for refusing treatment. . . .  Because SSR 82-59 does not set out an all-inclusive list [of reasons], '[a] full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable.'"); *McFadden v. Barnhart*, No. 94 Civ. 8734(RPP), 2003 WL 1483444, at *8 (S.D.N.Y. Mar. 21, 2003) ("[A] claimant may only be denied disability benefits if the [Commissioner] finds that she unjustifiably failed to follow prescribed treatment and that if she had followed the treatment, she would not be disabled under the Act"); SSR 96-7P, 1996 WL 374186, at *7 (1996) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual

may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

## **Conclusion**

For these reasons, the Court GRANTS Coderre's motion (Doc. 9), DENIES the Commissioner's motion (Doc. 10), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 25th day of June, 2012.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge